UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

ZOLTAN FRENKEL,

        Plaintiff,

    -v-                          No.  08 Civ. 6050 (LTS)(AJP)

NEW YORK CITY OFF-TRACK BETTING
CORP.,

        Defendant.

--------------------------------------------------------x

## OPINION AND ORDER

        Plaintiff Zholtan Frenkel ("Plaintiff" or "Frenkel"), a former employee of Defendant
New York City Off-Track Betting Corp. ("Defendant" or "OTB"), alleges that OTB violated his
"federal constitutional and statutory rights" by failing to comply with the terms of the settlement of
an earlier employment discrimination action, fostering or tolerating a hostile work environment in
which Plaintiff suffered harassment and mistreatment based on his religion, demoting him, and
subjecting him to disparate treatment for discriminatory and retaliatory reasons.  Plaintiff's
Amended Complaint refers to 42 U.S.C. §1983 ("Section 1983"), the equal protection and due
process clauses of the Fourteenth Amendment to the Constitution, and the First Amendment to the
Constitution in connection with these claims.  Frenkel seeks to recover damages.  The Court has
jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343.

        Magistrate Judge Peck issued an Opinion ("Opinion") on May 4, 2009 (docket entry
no. 46), recommending that Frenkel's motion for leave to amend his complaint to assert a cause of
action against OTB for "undermining" the earlier settlement agreement be denied as futile.  Frenkel

has filed timely objections to the Opinion.  Before the Court now are Frenkel's objections to the

Opinion and OTB's motion for summary judgment.  The Court has considered thoroughly all of the

parties' submissions and arguments in connection with each motion.  For the following reasons, the

Court adopts Judge Peck's recommended disposition of Frenkel's motion to amend the complaint,

and OTB's motion for summary judgment is granted.

BACKGROUND

The following facts are undisputed unless otherwise noted.

Frenkel I

Frenkel began his employment at OTB around January of 1979 as an electronic

technician.  (Frenkel Dep. 23:21-24.)  On October 23, 2003, Frenkel brought a federal employment

discrimination suit against OTB under Title VII of the Civil Rights Act of 1964.  Frenkel alleged a

denial of the opportunity for promotion to the position of supervising electronic technician based on

religious discrimination.  Frenkel v. New York City Off-Track Betting Corporation, No. 03 Civ.

8293 (S.D.N.Y. 2003) ("Frenkel I").  On August 17, 2004, a "Stipulation and Order of Settlement

and Discontinuance" was entered and signed in Frenkel I (docket entry no. 14).  The settlement

provided for, among other things, the payment of $19,999 in back wages to Frenkel and Frenkel's

promotion to the position of supervising electronic technician.  Id. at *2-4.  The settlement also

provided that, in accordance with the OTB Employee Handbook, Frenkel's promotion to

supervising technician would be subject to a one year probationary term.  (Capell Decl. Exs. J-K.)

OTB is a public benefit corporation that operates a network of 68 facilities for the

purpose of off-track pari-mutuel wagering on horse races in New York City.  See N.Y. Rac.

Pari-Mut. Wag. & Breed. L. § 603 (McKinney 2009); (Capell Decl. Ex. AA; Block Decl. ¶ 5.)

From 2002 to the present, Raymond Casey has been President and Chief Executive Officer of OTB.

(Capell Decl. Ex. AA; Block Decl. ¶ 4.)  The Office of Equal Employment Opportunity ("OEEO")

of OTB investigates internal complaints of discrimination on account of one's religion, among

other protected categories, as well as complaints of retaliation.  According to the OEEO manual,

after its factual investigation of a complaint, an investigating officer provides reports and

recommendations as to appropriate disciplinary action, if any.  The OEEO also mediates disputes

between OTB employees regarding possible discriminatory conduct and trains OTB employees on

the subject of workplace discrimination and how to properly file complaints concerning perceived

or actual discriminatory conduct.  (Capell Decl. Ex. C; Tall Decl. ¶¶ 5-7.)

*Events After Promotion Pursuant to the* Frenkel I *Settlement*

Frenkel alleges that following his promotion, new rules were put in place that

forbade supervisors from sending technicians from one borough to another and directed the less

senior supervisors such as himself to work with less experienced technicians.  (Compl. ¶¶ 25-27.)

At his deposition, Frenkel attributed these policies to his direct supervisor, Miguel Martinez

("Martinez"), but conceding that the seniority rule may have applied to all supervisors, and that he

has no knowledge of whether other supervisors had to follow the rule about dispatching technicians

during the time that he was a supervisor.  (Frenkel Dep. 76:13-16, 161:20-21.)

On September 26, 2004, Frenkel notified Martinez that a smashed muffin was lying

in a puddle of coffee on his chair.  This incident was not reported to the OEEO.  (Capell Decl. Ex.

D; Tall Decl. ¶ 33.)  Frenkel contends that he notified Martinez of his belief that the incident was

religiously motivated.  (Frenkel Aff. ¶ 9A.)

Around September of 2004, Frenkel wrote a letter to Martinez claiming that one of

Frenkel's subordinates, Anthony Monaco ("Monaco"), was deliberately ignoring calls to his Nextel

radio.  (Capell Decl. Ex. L.)  On December 2, 2004, Patricia McDonnell Riggio ("Riggio"), OTB's

Executive Director of Human Resources, wrote a letter to Monaco informing him that disciplinary charges for insubordination were to follow.  Monaco was subsequently suspended without pay pending a hearing on those charges.  (Capell Decl. Ex. N.)  On September 14, 2004, a group of Frenkel's subordinates, including Monaco, Calvin Armstrong ("Armstrong") and Scott Zagata ("Zagata"), approached Martin Tall ("Tall"), an OEEO officer, to complain about Frenkel's recent promotion, claiming that others who had been passed over for a promotion were more qualified. That same day, Frenkel approached Tall, who informed Frenkel that he could not discuss the subject of his conversation with Frenkel's subordinates.  (Tall Decl. ¶ 16.)  On December 22, 2004, Monaco filed a cross-complaint with the OEEO against Frenkel, alleging that Frenkel had retaliated against him for complaining about Frenkel's promotion, but no disciplinary action was taken. (Capell Decl. Ex. BB; Tall Decl. ¶ 17.)

On December 6, 2004, Frenkel discovered on his desk a document about the "Kapos," concentration camp prisoners of the Jewish faith that supervised and disciplined fellow prisoners on behalf of Nazi guards.  Frenkel brought the article, as well as the addition of his name to a handwritten "List of Idiots" on the inside of an OTB van, to the attention of Doreen Wong ("Wong") and Tall,[1] who memorialized the complaints in a letter on December 16.  (Capell Decl. Ex. M; Tall Decl. ¶ 11.)  Wong and Tall investigated both complaints, interviewing 26 different employees.  Kenny Fingeret ("Fingeret"), a technician, admitted to bringing the "Kapos" article to work to discuss with supervising technician David Lazerus ("Lazerus"), because he was a "history buff," but denied placing the article on Frenkel's desk.  (Capell Decl. Ex. M; Tall Decl. ¶ 12.) Wong and Tall were unable to find any discriminatory purpose in Fingeret bringing the article to

---

[1]    Wong was the Director of the OEEO from April 2004 to March 2006.  Tall, formerly Administrative Manager and Investigator, succeeded Wong as Director of the OEEO.

work, nor were they able to determine who had written on the inside of the van, and the OEEO declined to initiate disciplinary proceedings against anyone.  (Tall Decl. ¶¶ 11-15.)

On March 5, 2005, Riggio wrote a letter to Frenkel offering him a nine-month extension of the probationary period of his promotion, which Frenkel accepted in writing three days later.  (Capell Decl. Ex. R.)  During that period, a meeting took place with OTB management to address Frenkel's communication skills, in which Frenkel discussed his concern that Lazerus and Zagata were emboldening his coworkers to retaliate against him for his promotion.  (Frenkel Aff. ¶ 14B.)  On May 31, 2005, Carmelo FanFan ("FanFan"), Senior Director of Telecommunications at OTB since 2002, ordered Frenkel to take part in a management and conflict resolution training class, a course that Frenkel assumed was mandatory for all supervising technicians, as Lazerus was also present.  (Frenkel Aff. ¶ 12.)  On June 10, 2005, FanFan sent Frenkel a letter detailing the complaints about his performance as a supervising technician and offering suggestions as to how he might improve.  (Capell Decl. Ex. Q; FanFan Decl. ¶¶ 13-14.)  The complaints included allegations from Frenkel's subordinates of verbal abuse, unfair discipline, excessive monitoring, inefficient dispatching of technicians from one borough to the other and, on one occasion, instructing a subordinate to dismantle a rooftop satellite dish in a dangerous manner.  (FanFan Decl. ¶¶ 9-11.)

On January 20, 2006, Frenkel wrote FanFan a letter describing a January 16 verbal altercation between himself and Miranda over Miranda's late arrival from the OTB Central Repair Facility ("CRF").[2]  According to the letter, during the altercation Miranda called him a "f…ing

_____

[2]    Miranda had previously complained about the incident both to Sithal Dhanoa ("Dhanoa"), OTB's Chief Information Officer, and the OEEO, but since he did not claim that Frenkel's actions were discriminatory, the OEEO declined to investigate. (Tall Decl ¶¶ 22-23; FanFan Decl ¶ 14.)  In a January 20, 2006, memo to FanFan, Frenkel denied Miranda's version of the events and accused Miranda of deliberately ignoring calls to his Nextel radio.  (Capell Decl. Ex. S.)

jew" and said that "the Nazis should have finished the job."  Frenkel also asserted that, as already reported to Martinez, Miranda had given a Nazi-style salute on at least six prior occasions when Frenkel walked by.  (Capell Decl. Ex. S; Frenkel Aff. ¶ 16.)  The OEEO investigated Frenkel's claims, but was unable to find another employee at OTB to substantiate them.  (Tall Decl. ¶¶ 25-30.)  Frenkel only complained to the OEEO about the Kapos incident, the "List of Idiots," and the alleged anti-Semitic remarks and gestures by Miranda.  He did not make OEEO complaints concerning the other alleged disparate treatment or hostile workplace acts described in his complaint and evidentiary submissions on this motion.  (Pl. and Def. Local R. 56. 1 Stmts. ¶ 110; Tall Decl. ¶ 33.)  Plaintiff also complains generally and asserts in conclusory terms that his supervisors were not supportive of him in disputes with his subordinates, that the OEEO investigations were one-sided and biased, and that the results of the OEEO investigations, and the negative actions taken against him (including the imposition of various work rules and, ultimately, his demotion) were the product of manager bias against him as an Orthodox Jew and/or general resentment on the part of OTB of his favorable settlement of the 2003 litigation.  (See Frenkel Aff.; Compl. ¶¶ 11, 17, 39, 41A.)

*Frenkel's Demotion From Supervising Technician and Other Events*

On April 24, 2006, Dhanoa sent Frenkel a letter informing him that he had failed his probationary term as a supervising technician, an action that FanFan had previously recommended. (Capell Decl. Ex. U; FanFan Decl. ¶ 17.)  Frenkel was subsequently demoted to his original position of level III electronic technician and his base salary was reduced.  (Capell Decl. Ex. U.) Around that time, Martinez disputed the time at which Frenkel had returned to an OTB facility and declined to pay Frenkel for "maybe 15 to 30 minutes " worth of time.  (Frenkel Dep. 185:10-12.) On September 3, 2008, FanFan made the decision to restrict Frenkel from performing maintenance

in the field, due to complaints that Frenkel had failed to properly repair and maintain the equipment

at a Queens OTB facility and that he was charging billable time in which he did not work.  (FanFan

Decl. ¶ 18.)  Frenkel does not dispute that the complaints were made, but denies knowledge of

them at the time, and asserts that he did not engage in the complained-of behavior.  Frenkel

contends that the restriction from field assignments has reduced his income significantly because

opportunities to earn overtime have been curtailed.  (Frenkel Aff. ¶ 5.)  Frenkel also contends that

he has been denied overtime opportunities and "regularly overlooked" for overtime.  (Compl. ¶ 29;

Frenkel Aff. ¶ 2.)  An overtime analysis proffered by Defendant indicates that in all years prior to

2009 Frenkel's overtime hours put him well within the top group of overtime earners in his

department.  (Exs. BB and EE to Cappell Decl.)

*This Lawsuit*

Based on the foregoing facts, Frenkel alleges that, because of his religion and as

retaliation for his earlier lawsuit, OTB discriminated against him, tolerated the hostile environment

in which he worked, failed to treat him as it treated those similarly situated and ultimately demoted

him from a supervisory position to his original position as a technician.  Frenkel seeks damages for

OTB's alleged failure to abide by the terms of the 2004 settlement agreement, both for breach of

contract and a denial of a constitutionally protected interest in the fruits of the settlement.  Each

claim is brought under Section 1983.

DISCUSSION

*Motion for Leave to Amend*

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a

complaint "shall be freely given when justice so requires."  Courts generally grant leave to amend

in the absence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated

failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing

party by virtue of allowance of the amendment [or] futility of amendment." Foman v. Davis, 371

U.S. 178, 182 (1962).

Frenkel argues that the new cause of action he moves to add to his complaint is

federal in nature.  The Court has reviewed de novo Judge Peck's analysis of the applicability of

New York Racing, Pari-Mutuel Wagering and Breeding Law § 618's notice requirement in a claim

for damages based on noncompliance with Frenkel's prior settlement and finds Judge Peck's

analysis to be correct.  As Judge Peck rightly observes, "[w]here a party opposes leave to amend on

'futility' grounds, the appropriate legal standard is whether the proposed complaint fails to state a

claim, the traditional Fed. R. Civ. P. 12(b) standard" (Opinion at 5) (citing Lucente v. Int'l Bus.

Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002).  Because it is undisputed that Frenkel did not

comply with the notice requirements of § 618 with respect to his proposed new claim, the proposed

amendment fails to state a claim and is futile.  The Court therefore adopts Judge Peck's conclusions

as to the denial of Frenkel's motion to amend.

*Motion for Summary Judgment*

Summary judgment should be rendered when "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is therefore entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

For the purposes of summary judgment, the Court must construe the evidence in the light most

favorable to, and draw all inferences in favor of, the non-moving party.  Spinelli v. City of New

York, 579 F.3d 160, 166 (2d Cir. 2009).  The moving party bears the burden of establishing the

absence of any genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

(1986).  Nevertheless, "Rule 56(c) mandates the entry of summary judgment . . . against a party

who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The non-moving party cannot avoid summary judgment through vague assertions regarding the existence of disputed material facts, or "defeat the motion through mere speculation or conjecture."  W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990).

*Municipal Liability Under Section 1983*

Section 1983 provides Plaintiff with a statutory vehicle for bringing claims premised on constitutional violations committed under color of state law.  Government entities are not subject to respondeat superior liability under Section 1983 for the acts of their employees.  "Instead it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edits or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under §1983."  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).  Because OTB, the sole defendant in this action, is a municipal entity, it may not be held liable under Section 1983 for the alleged actions of its employees under the respondeat superior theory of liability.  See, e.g., Ortega v. New York City Off-Track Betting Corp., No. 97 Civ. 7582, 1999 WL 342353, at *6 (S.D.N.Y. May 27, 1999) (noting, in the course of adjudicating a Section 1983 claim against OTB, that "OTB is a public benefit corporation so that it cannot be held liable simply for isolated unlawful acts of its employees").  However, a municipal entity such as OTB may be liable for the actions of its employees if those employees acted pursuant to an official municipal policy that caused a constitutional tort.  Bd. of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997).

In order to state a claim for municipal liability under Section 1983, a plaintiff must establish three elements: (1) that an official policy or custom is in place; (2) that there is a causal link between plaintiff's alleged constitutional injury and the policy or custom; and (3) that plaintiff in fact suffered a constitutional injury. See Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995) (citations omitted). "Where the contention is not that the actions complained of were taken pursuant to a . . . policy that was formally adopted or ratified but rather that they were taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved." Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000). "Whether the official in question possessed final policymaking authority is a legal question, . . . which is to be answered on the basis of state law." Id. (citations omitted). The question of final policymaker status is one of law for the Court. Id. "Where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law." Id. at 57-58.

> [T]he trial judge must identify those officials . . . who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue. Once those officials who have the power to make policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, . . . or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity.

Jett v. Dallas Independent School Dist., 491 U.S. 701, 737 (1989); see also Mandell v. County of Suffolk, 316 F.3d 368, 385 (2d Cir. 2003).

Here, the pertinent state law has provided at all relevant times that the management powers of OTB, a public benefit corporation, are vested in its board of directors and/or general manager, and that the board may delegate "such powers and duties as it may deem proper" to "one or more of the directors, officers, agents or employees" of OTB.  See N.Y. Rac. Pari-Mut. Wag. & Breed. L. § 603 (McKinney 2009); see also Dangler v. New York City Off-Track Betting Corporation, 193 F.3d 130, 137 (2d Cir. 1999).

Frenkel contends that Carmelo FanFan (Senior Director of Telecommunications), who recommended Frenkel's demotion and restricted him from field work on and after September 3, 2008, Sithal Dhanoa (Chief Information Officer), who allegedly made the decision to demote Frenkel based on FanFan's recommendation (see Pl.'s Br. in Opp'n 5), and Doreen Wong and Martin Tall, who oversaw investigations of Frenkel's complaints, are policymakers for Monell liability purposes.  Without specifying the particular policy authority he claims should bind OTB or the allegedly involved policymakers, he argues that OTB's supervisors tolerated, failed to supervise and may even have encouraged the discrimination practiced by Frenkel's subordinates, co-workers and immediate superiors.  This failure to address his allegations of anti-Semitism and hostility to him because he had become a supervisor by court order, he argues, amounted to "an accepted custom or practice" of OTB.  (Pl.'s Br. in Opp'n 7.)  He also argues that, in light of the earlier settlement agreement, an inference could fairly be drawn that "the highest echelon" of OTB was aware of his situation and the alleged hostile work environment and discrimination.  (Pl.'s Br. in Opp'n 8-9.)  However, with the exception of the demotion decision by Dhanoa and the field work restriction imposed by FanFan, Plaintiff has failed to proffer facts sufficient to carry his burden of establishing that the actions of which he complains that could support Section 1983 liability were

taken, or acquiesced in, by policymakers whose actions may properly be imputed to OTB for municipal liability purposes.

By Plaintiff's own account, FanFan merely recommended his demotion to Dhanoa. Clearly, FanFan was not on this record the final decision maker with respect to the demotion.  It does appear, however, from the record that FanFan was the final decision maker with respect to the field work restriction that has allegedly curtailed Frenkel's overtime activities such that, if Plaintiff were able to establish actionable discriminatory conduct in that regard FanFan's decision could support OTB liability for the restriction and its consequences.

The various acts of harassment of which Plaintiff complains were all allegedly committed by Frenkel's subordinates or peers.  There is no allegation that any of those individuals was a policymaker for Monell purposes, nor could the record support such a conclusion.  Plaintiff's allegations that OTB encouraged such behavior as a retaliatory strategy in reaction to the settlement are entirely conclusory and do not specify any personnel allegedly involved in such fomentation. Accordingly, he has failed to carry his burden of demonstrating a predicate for Monell liability of OTB for the alleged harassment or hostile work environment on that basis.  To the extent Plaintiff brought his complaints to the attention of the OEEO,[3] the record, read in the light most favorable to him, indicates that the complaints were investigated extensively.  Plaintiff vehemently disagrees with the conclusions reached as a result of those investigations, but neither his disagreement with those conclusions nor his own conclusory allegations of insufficient investigation or bias are sufficient to make out the requisite demonstration of policymaker acquiescence in a longstanding

---

[3]     The Court assumes, without deciding, for purposes of this analysis that the OEEO Directors were policymakers for Monell purposes, although the record is unclear as to whether the OEEO merely made recommendations or was the final decision maker with respect to whether disciplinary action would be taken following investigations.

discriminatory policy or custom.  See Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 129 (2d Cir. 2004) (finding Monell liability not established on basis of inference of intentional acquiescence in discrimination based on deliberate indifference to allegations of discrimination where plaintiff's allegations "fail to establish that the [policymaker's] response to the alleged discrimination was clearly unreasonable in light of the known circumstances" (citation omitted)); Mack v. Port Auth., 225 F. Supp. 2d 376, 384 (S.D.N.Y. 2002) and cases cited therein (conclusory allegations of animus insufficient at summary judgment stage to frame genuine issue of fact).

Plaintiff has also failed to identify any policymaker responsible for his allegedly disparate treatment with respect to overtime opportunities and assignments (other than any that are attributable to the field work restriction imposed by FanFan, which is discussed below).

Accordingly, OTB is entitled as a matter of law to summary judgment in its favor dismissing Plaintiff's hostile work environment and overtime differential claims.

*Demotion and Field Work Restriction Claims*

While Plaintiff's proffers are sufficient to establish that the decision to demote him was made by a policymaker, he has failed to frame a genuine issue of material fact as to whether Dhanoa's demotion decision was the product of discriminatory intent or indifference to discrimination on Dhanoa's part.  Disparate treatment claims under Section 1983 are evaluated pursuant to the same three-part burden shifting inquiry established for Title VII actions by the Supreme Court's decision in McDonnell Douglas Corp. v. Green, 411 U.S. 791 (1973); cf. Back, 365 F.3d at 123 (applying McDonnell Douglas framework to Section 1983 case); Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004) (assessing an equal protection claim regarding workplace discrimination under Title VII framework)  Under that standard, a plaintiff must first make out a prima facie case that he was (1) a member of a protected group, (2) qualified for the position in

question, (3) suffered an adverse employment action, and (4) that the adverse employment action
was taken under circumstances giving rise to an inference of prohibited discrimination.  If a
plaintiff establishes his prima facie case, the burden shifts to the defendant to articulate a
legitimate, nondiscriminatory reason for the adverse employment action.  Upon such a showing by
the defendant, a plaintiff has the burden of demonstrating that the reason proffered by defendant is
a pretext for prohibited discrimination.  McDonnell Douglas, 411 U.S. at 802.  Given Plaintiff's
complete failure to allege, much less tender evidence, that Dhanoa was biased against him or was
even aware of the allegedly hostile work environment and Plaintiff's concession that the demotion
was based on FanFan's recommendation, it is questionable whether Plaintiff has even carried his
initial burden of tendering a prima facie case of discrimination with respect to the demotion.  Even
assuming that he has, Plaintiff has clearly failed to rebut as pretextual Defendant's demonstration
that the demotion was based on a legitimate nondiscriminatory reason – Plaintiff's failure to
perform satisfactorily in the supervisory position during the probationary period.  Accordingly,
Plaintiff's demotion-based claim against OTB fails on the merits and Defendant is entitled to
summary judgment dismissing it as a matter of law.

　　　　　Plaintiff's claim regarding the field work restriction is similarly fatally deficient.
Other than generalized allegations that FanFan and other unnamed members of "management" were
biased or bent on retaliation against him, Plaintiff has proffered no evidence that could reasonably
support an inference of discriminatory action in connection with FanFan's decision to restrict him
from going into the field.  Defendant has, furthermore, proffered undisputed evidence that FanFan's
action was taken after the receipt of, and based upon, complaints that Frenkel deliberately failed to
perform a necessary field repair and was abusing overtime.  Plaintiff has failed to tender any
evidence that would lead a rational fact finder to conclude that the proffered reason is merely a

pretext for prohibited discrimination.  OTB is, accordingly, entitled to summary judgment

dismissing this claim as a matter of law.

*Retaliation*

Frenkel argues that the alleged breaches of his settlement agreement, hostile work

environment and disparate treatment are the product of retaliation against him for the claims he

raised and the settlement he reached in the 2003 litigation, and asserts that such retaliation is

actionable under Section 1983 as violative of the First and Fourteenth Amendments to the

Constitution.  Frenkel's retaliation claim fails as a matter of law to the extent it is premised on the

equal protection clause of the Fourteenth Amendment.  The Second Circuit has declined to

recognize an equal protection claim for workplace retaliation following discrimination claims,

given the availability of Title VII as a vehicle for vindication of such claims.  Bernheim v. Litt, 79

F.3d 318, 323 (2d Cir. 1996).

While First Amendment retaliation claims by municipal employees are not

precluded, Plaintiff has failed to proffer evidence sufficient to frame a triable factual issue as to the

existence of a causal connection between his prior lawsuit and the alleged adverse employment

actions.  "To survive a motion for summary judgment on a First Amendment retaliation claim, the

plaintiff must present evidence which shows (1) that the speech at issue was protected, (2) that he

suffered an adverse employment action, and (3) that there was a causal connection between the

protected speech and the adverse employment action."  Cotarelo v. Vill. of Sleepy Hollow Police

Dep't, 460 F.3d 247, 251 (2d Cir. 2006) (citations omitted).  The requisite causal connection must

be "sufficient to warrant the inference that the protected speech was a substantial motivating factor

in the adverse employment action."  Blum v. Schlegel, 18 F.3d 1005, 1010 (2d Cir. 1994).

The first element, "[w]hether speech by a public employee is protected from retaliation under the First Amendment begins with this question: 'whether the employee spoke as a citizen on a matter of public concern.'"  Huth v. Haslun, No. 08-2203-cv, 2010 WL 839442, at *3 (2d Cir. March 11, 2010) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)).  This Circuit's decisions have not been entirely clear as to how and when public employees' allegations of governmental discrimination are matters of public concern.  Compare Cotarelo, 460 F.3d at 252 ("[S]peech on any matter of political, social, or other concern to the community is protected by the First Amendment. . . . [W]e have repeatedly held that discrimination in a government workplace is a matter of public concern." (citations omitted)) with Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 143 (2d Cir. 1993) (finding that retaliation for an employee's complaints of sexual harassment, despite being proven at trial and subsequently joined by similar allegations by a prior employee, did not violate the First Amendment because the complaints "were motivated by and dealt with [the plaintiff's] individual employment situation," were "personal in nature" and failed to implicate "system-wide discrimination" or "pervasive or systemic misconduct" (citations omitted)).  Frenkel's prior lawsuit, while targeting alleged governmental religious discrimination, did not allege widespread discrimination in the workplace.

The Court declines to determine whether Frenkel's speech in the form of his earlier lawsuit constituted a matter of public concern because, even if it did, the evidence proffered falls far short of supporting a rational inference as to the causal connection required to establish Frenkel's prima facie case.  The record is devoid of evidence, other than Frenkel's own conclusory assertions, to suggest that any of the complained of incidents or Frenkel's eventual demotion was substantially motivated by his speech in the form of his prior lawsuit.  For this reason, Frenkel has

failed to raise a triable issue of material fact with respect to his First Amendment retaliation claim and OTB is entitled as a matter of law to summary judgment dismissing this claim.

*Breach of Contract*

Frenkel's Section 1983-based breach of contract claim also fails as a matter of law. "A contract dispute . . . does not give rise to a cause of action under section 1983." Costello v. Town of Fairfield, 811 F.2d 784 (2d Cir. 1987).  Nor has Plaintiff framed a viable Section 1983 action for deprivation of any rights under the settlement agreement without due process of law.  He has not demonstrated the absence of adequate post-deprivation remedies for the alleged settlement agreement violations.  See id.  Insofar as Frenkel's proposed fifth cause of action seeks damages for breach of the terms of the Frenkel I settlement, it is a state law cause of action.  Totalplan Corp. of America v. Colborne, 14 F.3d 824, 832 (2d Cir. 1994).  For substantially the reasons explained in Judge Peck's May 4, 2009, Opinion concerning Plaintiff's motion to amend the complaint, Plaintiff's pursuit of any such state cause of action is precluded by his failure to provide timely notice pursuant to N.Y. Rac. Mut. Pari-Mut. Wag. & Breed. L. §618.  (See also Pl's Local Rule 56.1 Stmt. ¶115 (undisputed that Plaintiff never filed a notice of claim for a breach of the settlement agreement.))

Defendant is therefore entitled to judgment dismissing Plaintiff's breach of contract claims as a matter of law.

CONCLUSION

For the foregoing reasons, the Court adopts Magistrate Judge Peck's May 4, 2009, Opinion and denies Plaintiff's motion to amend further his complaint.  Defendant's motion for summary judgment is granted in all respects.  The Clerk of Court is respectfully requested to enter judgment in Defendant's favor, dismissing the complaint, and close this case.

This Opinion and Order resolves docket entries nos. 26 and 33.

SO ORDERED.

Dated:       New York, New York
             March 29, 2010

                                        _____
                                        LAURA TAYLOR SWAIN
                                        United States District Judge